## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JESSE CAMPBELL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSGENOMIC, INC., PAUL KINNON, ROBERT M. PATZIG, MYA THOMAE, MICHAEL A. LUTHER, and DOIT L. KOPPLER, II,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jesse Campbell ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Transgenomic, Inc. ("Transgenomic" or the "Company") against Transgenomic, the Company's President, Chief Executive Officer and Director Paul Kinnon, and the other members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Transgenomic, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between Transgenomic, New Haven Labs Inc. ("Merger Sub") and Precipio Diagnostics, LLC ("Precipio").

2.     On October 12, 2016, Transgenomic announced that it had entered into an

Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Precipio, with Precipio as the surviving entity, and, following the merger, Transgenomic will change its name to Precipio Inc. ("New Precipio") (the "Proposed Transaction").  As set forth below, the Merger Agreement was subsequently amended on February 2, 2017.

3.      If the Proposed Transaction is completed: (i) the outstanding common units of Precipio will be converted into the right to receive approximately 160.6 million shares of common stock of New Precipio ("New Precipio common stock"), which will result in Precipio common unit holders owning approximately 53% of the issued and outstanding shares of New Precipio common stock on a fully diluted basis, taking into account the issuance of shares of convertible preferred stock of New Precipio ("New Precipio preferred stock") in the merger and the private placement (the "fully diluted New Precipio common stock") and (ii) the outstanding preferred units of Precipio will be converted into the right to receive approximately 24.1 million shares of New Precipio preferred stock with an aggregate face amount equal to $3 million (based upon the purchase price of the new preferred stock of New Precipio in the new preferred stock financing), which will result in the Precipio preferred unit holders owning approximately 8% of the fully diluted New Precipio common stock.

4.      In connection with the merger, in addition to the New Precipio preferred stock to be issued to holders of preferred units of Precipio, New Precipio also will issue shares of New Precipio preferred stock and New Precipio common stock in a related private placement, whereby: (i) Holders of certain secured indebtedness of Transgenomic will receive in exchange for such indebtedness, approximately 24.1 million shares of New Precipio preferred stock in an amount equal to $3 million, which represents approximately 8% of the fully diluted New Precipio common

stock, and approximately 9.8 million shares of New Precipio common stock, which represents approximately 3% of the fully diluted New Precipio common stock; and (ii) New Precipio will issue for cash up to approximately 56.2 million shares of New Precipio preferred stock for $7 million to investors in a private placement, which represents approximately 18% of the fully diluted New Precipio common stock.

5.     Transgenomic is also requesting shareholder approval of the issuance of 3.0 million shares of Transgenomic common stock upon the exercise or exchange of certain warrants issued by Transgenomic in 2016 (the "Warrants").

6.     Defendants have asked Transgenomic shareholders to vote in favor of this extremely complex Proposed Transaction by disseminating a materially incomplete and misleading Proxy Statement (the "Proxy"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the terms and details surrounding discussions regarding alternative strategic proposals the Company received from other parties; (ii) financial projections for the Company and Precipio; and (iii) the valuation analyses performed by the Company's financial advisor, Craig-Hallum Capital Group LLC ("Craig-Hallum"), in support of its so-called "fairness opinion."

7.     The special meeting of Transgenomic shareholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the special meeting, so that they can properly exercise their corporate suffrage rights.

8.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction

and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Transgenomic shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Transgenomic maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff is, and at all relevant times has been, a shareholder of Transgenomic.

13.     Defendant Transgenomic is incorporated in Delaware and maintains its principal executive offices in Omaha, Nebraska.  Transgenomic provides research tools to the life sciences industry.  These tools enable researchers to discover and understand variation in the human genetic code in order to accelerate and improve drug development and diagnostics.

14.     Individual Defendant Paul Kinnon serves as Transgenomic's President and Chief Executive Officer and is also a director of the Company.

15.     Individual Defendant Robert M. Patzig is, and has been at all relevant times, a Transgenomic director.

16.     Individual Defendant Michael A. Luther is, and has been at all relevant times, a Transgenomic director.

17.      Individual Defendant Mya Thomae is, and has been at all relevant times, a Transgenomic director.

18.     Individual Defendant Doit L. Koppler, II is, and has been at all relevant times, a Transgenomic director.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Transgenomic (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

20.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2016, there were approximately 24.79 million shares of Transgenomic common stock outstanding, held by hundreds to thousands of individuals and entities

scattered throughout the country. The actual number of public shareholders of Transgenomic will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.          Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.          A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Materially Incomplete and Misleading Proxy

21.      On February 3, 2017, Defendants caused the materially incomplete and misleading Proxy to be filed with the SEC and disseminated to Transgenomic's shareholders.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

22.      First, Defendants have omitted material information concerning terms and details surrounding discussions regarding alternative strategic proposals the Company received from other interested parties, and the various terms proposed by the respective parties involved in the Proposed Transaction prior to the signing of the Merger Agreement.

23.      The Proxy at page 31 states that 28 strategic investors entered into non-disclosure

agreements with the Company, and that one strategic investor "made an offer." The Proxy fails to disclose whether the non-disclosure agreements ("NDAs") contained standstill provisions that prohibit the signatories from taking actions to make a superior proposal, and further fails to provide any information regarding the terms of the offer received. Such information is clearly material to Transgenomic shareholders; the terms of the NDAs are material because they relate directly to whether or not investors that expressed interest in pursuing a strategic transaction with the Company are now foreclosed from doing so; and information regarding the terms of the offer received needs to be disclosed so that shareholders can assess whether Defendants failed to pursue a potentially superior proposal. The omission of this information renders the vague references to the NDAs and the mysterious "offer" on page 31 of the Proxy incomplete and therefore misleading.

24.     The Proxy also references that the Company sold parts of its Genetic Assays and Platforms ("GAP") business on September 10 and December 1, 2015 (Proxy 30), and sold its Patient Testing ("PT") business unit in June 2016 (Proxy 31), but fails to provide any information regarding the terms of these sales, including the consideration received by the Company. Such information is material to Transgenomic shareholders, as it relates directly to the value of the Company's businesses and is material in understanding the value of the Company's remaining business segments that are affected by the Proposed Transaction and the fairness of the exchange ratio. The omission of such information renders the vague references to the sale of the Company's GAP and PT business segments incomplete and therefore misleading.

25.     With respect to the Proposed Transaction, the Proxy from pages 31-35 alludes to various "term sheets" that were exchanged between the parties between June 30, 2016 and October 12, 2016, but fails to provide any of the "terms" contained in the various "term sheets". Such information is material to Transgenomic shareholders, as it is necessary for them to understand

how negotiations regarding the terms of the Proposed Transaction and exchange ratio unfolded, and whether or not there were any meaningful negotiations by Defendants to obtain the best possible exchange ratio for Plaintiff and the Class. Without knowing how the proposed terms of the Proposed Transaction changed over the course of negotiations, shareholders are unable to assess whether the current exchange ratio is fair to them. The omission of such information renders the vague references in the Proxy to the various "term sheets" exchanged between the parties incomplete and misleading.

26.     The Proxy also notes that Individual Defendant Patzig was extensively involved in the negotiations leading up to the signing of the Merger Agreement, and that Mr. Patzig "has an interest in the funds managed by Third Security that own Transgenomic common stock, preferred stock and secured debt." Proxy 34. While the Proxy notes that the Board determined that Mr. Patzig's holdings were "immaterial" to him, the value of his interest in the funds managed by Third Security must be disclosed so that shareholders can assess for themselves whether this conflict of interest was significant and calls the legitimacy of the strategic review and negotiation process into question. Third Security is participating in the private placement and conversion of debt and convertible preferred stock into common stock, and therefore has interests in the Proposed Transaction that are different from the Company's remaining shareholders. Such shareholders would therefore find it material to know the value of Mr. Patzig's interest in Third Security, and the omission of such information renders the vague description of Mr. Patzig's interest on pages 34 and 51 of the Proxy incomplete and misleading.

27.     The Proxy also fails to provide Transgenomic shareholders with sufficient information to assess and understand the valuation analyses performed by Craig-Hallum. Defendants have told Transgenomic shareholders that such analyses support the financial fairness

of the exchange ratio, and it is therefore imperative that shareholders receive all material information necessary for them to assess these analyses.

28.     With respect to the various references to the "exchange ratio" that Craig-Hallum opined was "fair, from a financial point of view, to the holders of Transgenomic common stock," Proxy 8, the Proxy fails to quantify or value the mysterious exchange ratio, and Transgenomic shareholders are therefore unable to assess the fairness of the exchange ratio and the various valuation analyses performed by Craig-Hallum which purportedly show that the exchange ratio is "fair".  The Proxy refers to the "exchange ratio" on pages 8, 9, 20, 34-36, 38-39, 46, 48, and 63, but the exchange ratio is never quantified or valued.   Such information is clearly material to Transgenomic's shareholders, who are being asked to assess the fairness of the mysterious "exchange ratio" and determine whether or not to vote in favor of the Proposed Transaction.  The omission of such information renders the vague references to the "exchange ratio" in the Proxy, as well as the statements that the exchange ratio is "fair, from a financial point of view" incomplete and misleading.

29.     Further, the Proxy notes that Craig-Hallum determined that the exchange ratio was "fair, from a financial point of view, to the holders of Transgenomic common stock" on October 12, 2016, and issued its fairness opinion based upon the exchange ratio set forth in the original Merger Agreement.  However, on February 2, 2017, Transgenomic and Precipio entered into an Amended Merger Agreement, which, amongst other things, revised the exchange ratio set forth in the original Merger Agreement.  Proxy 35.  The Proxy fails to explain or quantify precisely how the exchange ratio was "revised."   Given that Craig-Hallum did not reassess the fairness of the exchange ratio to Transgenomic common stockholders based upon the "revised" exchange ratio, it is imperative that shareholders understand how the exchange ratio changed between the original

Merger Agreement and the Amended Merger Agreement.

30.    With respect to Craig-Hallum's *Comparable Public Companies Analysis* and *Comparable M&A Transaction Analysis*, the Proxy notes that Craig-Hallum calculated various multiples for each of the companies and transactions it selected for these analyses.  However, the Proxy fails to disclose the individual multiples Craig-Hallum calculated for each Company and transaction.  Proxy 41-44.  The omission of the individual multiples for each company and transaction renders the summary of these analyses and the implied enterprise values listed in the corresponding sections of the Proxy materially incomplete and misleading.

31.    A fair summary of a *Comparable Company Analysis* and *Comparable Transactions Analysis* requires the disclosure of the individual multiples for each company and transaction, just as such information is presented to a board asked to assess the fairness of a transaction.  Merely providing the range that a banker *applied* is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

32.    With respect to Craig-Hallum's Discounted Cash Flow ("DCF") Analysis of Transgenomic, the Proxy notes that Craig-Hallum "adjusted upward" the discount rates it utilized in connection with its analysis based on its "professional judgment," but fails to indicate how much Craig-Hallum "adjusted" the discount rates "upward."  Proxy 45.  Such information is material to Transgenomic shareholders, as the discount rate a banker chooses to utilize in connection with a DCF Analysis has a significant impact on the final valuation.

33.    As a highly-respected law professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1562 (2006).

34. Professor Davidoff hones in on precisely why shareholders should not rely solely on a banker's valuation analyses, and why management's underlying inputs are critical - namely, because bankers take management's inputs and then make various highly subjective decisions to arrive at a share valuation. For example, in a DCF analysis, Professor Davidoff explains that a banker takes management's forecasts, and then makes several key choices "**each of which can significantly affect the final valuation**." *Id*. at 1576.

35. And as Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.
>
> **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

36. With respect to Transgenomic's and Precipio's financial projections, the Proxy fails to disclose the projected fiscal year 2017 and 2018 EBITDA for both companies that were based

on input from their respective management teams, which were explicitly relied upon by Craig-Hallum in connection with its valuation analyses. Proxy 41, 43. The omission of the EBITDA projections renders the summary of projections contained on page 50 of the Proxy incomplete and misleading. Indeed, revenue and gross profit projections alone are inherently misleading without corresponding EBITDA projections.

37.     The Proxy also fails to provide net income (loss) projections for Transgenomic, which is a GAAP (generally accepted accounting principle) measure that is routinely reconciled to EBITDA.

38.     Additionally, the Proxy only provides revenue distribution projections for Precipio, and omits projections for other key metrics including EBITDA, Gross Profit, and/or cash flow. Precipio management presumably prepared projections in addition to the revenue distribution projections included on page 50 of the Proxy; indeed the Proxy states that "Precipio's internal financial projections *included the following*," but does not purport to be a complete picture of all the internal financial projections prepared by Precipio and provided to Transgenomic and Craig-Hallum in connection with the Proposed Transaction. Such additional internal financial projections for Precipio are material to Transgenomic shareholders, as they are maintaining equity in the post-close combined company. The omission of such projections renders the revenue distribution projections on page 50 of the Proxy incomplete and misleading.

39.     Further, the Proxy fails to disclose "the combined company's internal financial projections for the fiscal years ending December 31, 2016 through December 31, 2020," which were prepared and furnished to Craig-Hallum by the management of Precipio for use in connection with its fairness opinion. Proxy 40. Given that Transgenomic shareholders will maintain equity in the post-close combined company, the pro forma projections for the combined company are

clearly material information.  The omission of such projections renders the vague reference to them on page 40 of the Proxy, and the projections on page 50 of the Proxy, incomplete and misleading.

40.     Lastly, the Proxy fails to disclose the "estimates of net operating loss tax benefits" that Craig-Hallum reviewed and relied upon in connection with its fairness opinion.  Proxy 47. Such tax benefits are material to Transgenomic shareholders given that they will maintain equity in the post-close combined company.  The omission of such projections renders the vague reference to them on page 47 of the Proxy, and the projections on page 50 of the Proxy, incomplete and misleading.

41.     If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, not merely excerpts of certain sets of projections.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known--but it may not choose half-truths.

42.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## II.      The Merger Agreement's Deal Protection Provisions Deter Superior Offers

43.      The Individual Defendants have also agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Transgenomic.

44.      First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Transgenomic shareholders.  This provision generally states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

45.      Additionally, the Merger Agreement grants Precipio recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with Transgenomic, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

46.      The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Precipio can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Precipio, to the detriment of Transgenomic's public shareholders.

47.     Lastly, the Merger Agreement provides that Transgenomic must pay Precipio a termination fee of $256,500 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Transgenomic shareholders with a superior offer.

48.     Ultimately, these preclusive deal protection provisions restrain Transgenomic's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

49.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Transgenomic's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

52.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the terms and details surrounding discussions regarding alternative strategic proposals the Company received from other interested parties; (ii) financial projections for the Company and Precipio; and (iii) the valuation analyses performed by the Company's financial advisor, Craig-Hallum.

54.     In so doing, Defendants made untrue statements of fact and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Board was therefore reckless, as each Board member had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

55.     The Board members knew or were reckless in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Board members undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed

Transaction; indeed, the Proxy states that Craig-Hallum reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Craig-Hallum as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Board members were privy to and had knowledge of the projections for the Company and Precipio and the proposals received from interested parties and communications with such parties. The Individual Defendants knew or were reckless in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Craig-Hallum's analyses in connection with their receipt of the fairness opinion, question Craig-Hallum as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

56.     Individual Defendant Paul Kinnon, the Company's President and Chief Executive Officer, was, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Mr. Kinnon was negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which he was required to do carefully as the Company's CEO. Indeed, Mr. Kinnon was intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections. Transgenomic is also deemed negligent as a result of Mr. Kinnon's negligence in preparing and reviewing the Proxy.

57.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Transgenomic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Transgenomic, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

62.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until Defendants disclose the material information discussed above which has been omitted from the Proxy;

      C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

      D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

      E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 17, 2017

Respectfully submitted,

**JESSE CAMPBELL, Plaintiff**

<u>s/ David W. Rowe</u>
**KINSEY ROWE BECKER & KISTLER, LLP**
DAVID W. ROWE - 19155
Pioneers Pointe Plaza
3800 VerMaas Place, Suite 100
Lincoln, NE 68502-4454
Main Phone: (402) 438-1313
Direct Line: (402) 434-9050
Fax: (402) 438-1654
E-Mail: drowe@krbklaw.com

And

**OF COUNSEL:**
**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

***Attorneys for Plaintiff***