**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

JESSE CAMPBELL, Individually and on
Behalf of All Others Similarly Situated,

          Plaintiff,

    v.

TRANSGENOMIC, INC., PRECIPIO,
INC., and PAUL KINNON,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:17-cv-03021

**AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF THE
SECURITIES EXCHANGE ACT OF
1934**

**JURY TRIAL DEMANDED**

Lead Plaintiff Jesse Campbell ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other former stockholders of Transgenomic, Inc. ("Transgenomic" or the "Company") against Transgenomic, its post-merger entity Precipio, Inc. ("New Precipio"), and Transgenomic's former President, Chief Executive Officer, Interim Chief Financial Officer and Secretary, and Director Paul Kinnon (collectively, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rules 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. 244.100, in connection with the merger and certain related transactions (collectively, the "Transaction") between Transgenomic, New Haven Labs Inc. ("Merger Sub") and Precipio Diagnostics, LLC ("Precipio").

2.      Transgenomic is a global biotechnology company headquartered in Omaha,

Nebraska.  The Company focuses on advancing personalized medicine in oncology, cardiology, neurology, and inherited diseases through advanced diagnostic technologies, products, and services.  Its patented ICE COLD-PCR powers the Company's liquid biopsy analyses that can be run on any sequencing platform to deliver a comprehensive genomic profile that includes all mutations.  The Company also provides specialized clinical and research services to biopharmaceutical companies developing targeted therapies.

3.      On October 12, 2016, Transgenomic announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub would merge with and into Precipio, with Precipio as the surviving entity (the "Merger") and, following the Merger, Transgenomic would change its name to Precipio Inc. (referred to herein as "New Precipio" or the "Combined Company").

4.      At a special meeting of stockholders held on June 5, 2017, a majority of Transgenomic stockholders voted to approve the Transaction, after being solicited with and relying upon a materially false, incomplete, and misleading definitive proxy statement (the "Proxy") (attached as Exhibit A hereto) that was filed with the SEC on May 12, 2017 and mailed to Transgenomic stockholders on or about May 15, 2017.

5.      Most significantly, the Proxy provided Transgenomic stockholders with false, inaccurate, incomplete, and misleading ███████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ Indeed, in assessing the

fairness of the Transaction, █████████████████████████ were material to Transgenomic

stockholders, because ███████████████ were necessary to assess the fairness of the exchange ratio[2]

and the Transaction's structure.   By ████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

6.       Furthermore,  while  ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ █ █████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[1] Citations to ████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████ raig-Hallum acted as Transgenomic's financial
advisor in connection with the Transaction.

[2] The exchange ratio set forth in an amendment to the Merger Agreement (dated February 2, 2017)
resulted in each fully diluted Precipio common unit being converted into 24.4255 shares of New
Precipio common stock.

[3] ███████████████████████████████████████████████████
████████████████████████████████████████



10.    To summarize, the Proxy was false and misleading because it: ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

11.     Following the stockholder vote, on June 30, 2017, which Defendants solicited via the false and misleading Proxy, the Merger was consummated.  As a result: (i) the outstanding common units of Precipio were converted into the right to receive 160,585,422 shares of common stock of New Precipio ("New Precipio common stock"), which resulted in Precipio common unit holders owning approximately 52% of the issued and outstanding shares of New Precipio common stock on a fully diluted basis, taking into account the issuance of shares of convertible preferred stock of New Precipio ("New Precipio preferred stock") in the Merger and the private placement (the "fully diluted New Precipio common stock") and (ii) the outstanding preferred units of Precipio were converted into the right to receive 24,087,813 shares of New Precipio preferred stock with an aggregate face amount equal to $3 million (based upon the purchase price of the new preferred stock of New Precipio in the new preferred stock financing), which resulted in the Precipio preferred unit holders owning approximately 8% of the fully diluted New Precipio common stock.

12.     Additionally, New Precipio issued common and preferred shares in connection with the conversion of Transgenomic debt and a private placement. New Precipio issued 24,087,813 shares of preferred stock, approximately 8% of the fully diluted New Precipio common stock, and approximately 10.4 million shares of common stock, approximately 3% of the fully diluted New Precipio common stock, to Third Security, LLC in exchange for eliminating Transgenomic's

secured indebtedness (the "Conversion of Secured Debt"). New Precipio also issued 56,204,898

shares of senior convertible preferred stock, approximately 18% of the fully diluted New Precipio

common stock, in exchange for working capital to finance the merger (the "Private Placement").

13.     Finally, Transgenomic issued 2,999,836 shares of common stock upon the exercise

or exchange of certain warrants issued by Transgenomic in 2016 (the "Warrants") to Third Security

and Crede Capital Group, LLC.

14.     After the culmination of this series of transactions, Transgenomic common

stockholders were left with less than 9% ownership of the fully diluted New Precipio common

stock. This severely diluted ownership percentage significantly undervalues Transgenomic by at

least half.

15.     Defendants solicited Transgenomic stockholders to vote in favor of this extremely

complex Transaction by disseminating the materially false, incomplete, and misleading Proxy, in

violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rules 14a-9 an Regulation G

promulgated thereunder.

16.     The special meeting of Transgenomic stockholders to vote on the Transaction was

held on June 5, 2017.  As a result of the material omissions and false and misleading statements in

the Proxy, the Company's stockholders were unable to fairly exercise their corporate suffrage

rights, and were caused to vote in favor of the unfair Transaction.  The Transaction could not have

been consummated without the approval of Transgenomic's stockholders, and the Proxy was

therefore an essential link necessary to complete the Transaction, whereby Transgenomic

stockholders were damaged.

17.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and

Regulation G.  Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC rules promulgated thereunder.

19.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Transgenomic and now New Precipio maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

21.     Plaintiff was, at all relevant times, a stockholder of Transgenomic.  As a result of the Transaction, Plaintiff is now a stockholder of New Precipio.

22.     Defendant Transgenomic is incorporated in Delaware and maintains its principal executive offices in Omaha, Nebraska.  Transgenomic provides research tools to the life sciences

industry. These tools enable researchers to discover and understand variation in the human genetic code in order to accelerate and improve drug development and diagnostics.

23.     After the Merger was consummated, Transgenomic changed its name to Precipio, Inc. (referred to herein as New Precipio). New Precipio is a Delaware corporation that maintains offices and facilities in Omaha, Nebraska.

24.     Defendant Paul Kinnon, at all relevant times, served as Transgenomic's President, Chief Executive Officer, Interim Chief Financial Officer and Secretary and was also a director of the Company.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public stockholders of Transgenomic who were harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of, April 12, 2017, the record date for Transgenomic stockholders to be eligible to vote on the Transaction, there were over 26.8 million shares of Transgenomic common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Transgenomic will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)        whether Defendants misrepresented or omitted material information concerning the Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rules 14a-9 and Regulation G;

        ii)      whether Mr. Kinnon violated Section 20(a) of the Exchange Act; and

        iii)     whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote for the Transaction based on the materially false, incomplete, and misleading Proxy.

c.        Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.        Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.        The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.        Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.        A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.        The Materially Incomplete, False, and Misleading Proxy

27.      On May 12, 2017, Defendants caused the materially incomplete, false, and misleading Proxy to be filed with the SEC and disseminated to Transgenomic's stockholders.  The Proxy solicited the Company's stockholders to vote in favor of the Transaction.

28.      Mr. Kinnon and Transgenomic were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresented and omitted material information that was necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The False and Misleading* ███████████████████████████

29.      As noted above, as a result of Kinnon's and Transgenomic's negligence, the Proxy



31.     In  other  words, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

32.     The Proxy misrepresented ████████████████████████████

███████████████████████████████████ which  is  inherently  misleading.   Indeed,  in

assessing the fairness of the Transaction, █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████████████████
█████████████████████████████

33.     Defendants were also negligent by allowing the Proxy to omit ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

34.　██████████████████████████████████ were material to

Transgenomic's stockholders, ████████████████████████████████████

████████████████████████████████

35.　Because corporate management seek to portray their companies in the most-

favorable light, they routinely include unstandardized non-GAAP projections in communications

with stockholders, which make their companies look more valuable than they really are.  The SEC

has taken note of this misleading practice and, in recent years, has heightened its scrutiny of the

use of non-GAAP financial measures in stockholder communications.  Amongst other actions, on

May 17, 2016, the SEC updated its interpretive guidance on non-GAAP financial measures.[4]

36.　The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use

by publicly traded companies of unique company-specific non-GAAP financial measures (as was

included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to
> supplement the GAAP information, has become the key message to
> investors, crowding out and effectively supplanting the GAAP
> presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst,
> our Chief Accountant in the Division of Corporation Finance and I,
> along with other members of the staff, have spoken out frequently
> about our concerns to raise the awareness of boards, management
> and investors.  And last month, the staff issued guidance addressing
> a number of troublesome practices *which can make non-GAAP
> disclosures misleading*: the lack of equal or greater prominence for
> GAAP measures; exclusion of normal, recurring cash operating
> expenses; individually tailored non-GAAP revenues; lack of
> consistency; cherry-picking; and the use of cash per share data.  I
> strongly urge companies to carefully consider this guidance and
> revisit their approach to non-GAAP disclosures.  I also urge again,
> as I did last December, that appropriate controls be considered and

---

[4] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND
EXCHANGE        COMMISSION        (May        17,        2016),
https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[5]

37.     SEC Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

38.     Here, ██████████████████████     ████████████████████████████ ████████████████████████████████████████     violation of Regulation G constitutes a violation of Section 14(a) by soliciting proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78n(a); *see, e.g.*, *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002) ("[O]mission of information from a proxy statement will violate [Section 14(a) if] the SEC regulations specifically require disclosure of the omitted information in a proxy statement.")

39.     The omission of ████████████████████████████was also a materially misleading omission in violation of SEC Rule 14a-9.

---

[5] *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

████████████████████████████████████████████████████████
█████████████████████████████████

40. ██ In addition to █████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

41.     If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, ███████████████████████ █████████████████     With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known--but it may not choose half-truths.

42.     In sum, The Proxy falsely and misleadingly ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████ in

contravention of the Exchange Act.  As a result of these material false statements and omissions,

Plaintiff and the other members of the Class were unable to make an informed decision regarding

whether to vote in favor of the Transaction, and were deceived into thinking that ██████████

████████████████████████ Plaintiff and the Class have therefore been damaged, as their

Transgenomic shares were undervalued in the Transaction and they retained an unreasonably low

percentage of the post-Transaction Combined Company.

## II.     Plaintiff and the Class Suffered Financial Loss as a Result of the False and Misleading Proxy, Which Was an Essential Link Necessary to Effectuate the Unfair Transaction

43.     The Transaction undervalued Transgenomic, unfairly diluted Transgenomic

stockholders, and resulted in Plaintiff and the Class owning an unfair and inadequate percentage

of the post-Transaction Combined Company.

44.     Specifically, as a result of the Transaction, Transgenomic's common stockholders

only owned only approximately 9% of the fully diluted New Precipio common stock.

Transgenomic was undervalued in the Transaction, and, had it been properly valued,

Transgenomic's stockholders should have owned at least double the percentage of the Combined

Company.

45.     ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████ Transgenomic

stockholders would have recognized that the initial Transaction terms were unfair and undervalued

the Company as of the date of the Merger Agreement.

46.     The Transaction also undervalued Transgenomic in light of the Company's independent growth prospects and significant strategic initiatives the Company accomplished prior to the consummation of the Transaction.

47.     In a September 2015 investor presentation, Transgenomic estimated that the oncology market opportunity alone is worth $2.5 billion in annual test revenue.

48.     In the months following the announcement of the Transaction, Transgenomic made significant strides towards cashing in on this huge market opportunity.

49.     On January 12, 2017, Transgenomic announced a significant, game-changing licensing agreement with the largest laboratory services provider in Canada, LifeLabs.  LifeLabs selected Transgenomic's ICE COLD-PCR technology as its mutation enrichment platform for cancer testing.  The three-year, renewable agreement includes a non-exclusive license to the ICP technology in Canada.  Separately, Transgenomic also announced issuance of a new Canadian patent for ICP.

50.     Commenting on the significance of the agreement, Defendant Kinnon stated:

> LifeLabs is amongst the largest laboratory service provides in North America, and we view their adoption of ICE COLD-PCR as a key validation of both the technology and our commercial model that focuses on licensing to a wide variety of molecular diagnostics partners worldwide…We believe that this sizable commercial licensing agreement is indicative of the growing traction in the marketplace we have been anticipating, and we believe that it will be followed by additional significant ICP agreements going forward.

51.     Upon the announcement of the LifeLabs Agreement, Transgenomic's stock price soared 148.8%.  As noted in a *Seeking Alpha* article regarding the LifeLabs Agreement:

> Nano cap Transgenomic (TBIO +148.8%) is the newest member of the "biotech rocket" club.  Shares are up on a 14x surge in volume in response to its announcement that Canadian reference laboratory LifeLabs has selected ICE COLD-PCR as its mutation enrichment

platform for cancer testing on tissue samples. The renewable contract will run for three years initially.[6]

52.     Despite the fact that Transgenomic entered into this significant contract months before the Transaction was consummated, the Transaction did not account for Transgenomic's significantly increased value as a result of the contract.

53.     Furthermore, on June 13, 2017, Transgenomic announced that the European Patent Office (EPO) confirmed its intention to grant a patent covering multiplexed ICE COLD-PCR technology in the European Union (EU).   This marked another significant development for Transgenomic, as reflected in the comments Mr. Kinnon made:

> We are delighted that the EPO has decided to grant this important patent for our ICE COLD-PCR (ICP) technology.  We have been anticipating the approval of this patent in the EU, which fully opens up a major new market for the company to commercialize its MIX-ICP products.  This new patent allows us to build on our initial presence in Europe to implement a full-scale EU-wide commercialization campaign and also complements our expansion plans for Asia. These initiatives will be a focus of the post-merger business plan.

54.     Precipio's CEO, Ilan Danieli, reiterated the significance of the EPO's announcement, stating:

> This new patent is significant because we see the European market for clinical diagnostic testing as a key area for the expansion and adoption of ICP technology and products outside of the US market. In the past Transgenomic has received interest in the MX-ICP technology from various European players, but it had limited ability to provide MX-ICP products to this market.  This new patent will support our plans for the merged company to expand its activities into major new markets.

---

[6] Douglas W. House, *Transgenomic inks ICE COLD-PCR deal in Canada; shares up 149%*, SEEKING ALPHA (Jan. 12, 2017), https://seekingalpha.com/news/3234944-transgenomic-inks-ice-cold-pcr-deal-canada-shares-149-percent.

55.     In sum, the false and misleading Proxy was an essential link in accomplishing the Transaction, which undervalued Transgenomic and caused Plaintiff and the Class to suffer financial loss in that they did not retain a fair equity stake in the post-Transaction Combined Company.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

58.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

59.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that

measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omitted information required by SEC Regulation G, 17 C.F.R. § 244.100, ███████████████████████████████████████████

60.     The omission of information from a proxy statement will violate *both* Section 14(a) *and* Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

61.     Defendants issued the Proxy to solicit Transgenomic stockholders to vote in favor of the Transaction. Mr. Kinnon, and thus Transgenomic, reviewed and authorized the dissemination of the Proxy, which misstated and falsely ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████

62.     In so doing, Defendants made untrue statements of fact and/or omitted material information necessary to make the statements made not misleading. Mr. Kinnon, by virtue of his role as Transgenomic's President, Chief Executive Officer, Interim Chief Financial Officer and Secretary, and a Director, was or should have been aware of the Proxy's false statements and material omissions, but failed to correct them, in violation of Section 14(a), Rule 14a-9, and Regulation G.

63.     Defendant Kinnon knew or was negligent in not knowing that the Proxy was materially misleading and omitted or misstated the above-referenced material information.

Kinnon reviewed and relied upon the omitted information identified above in connection with his decision to approve and recommend the Transaction; indeed, the Proxy states that Craig-Hallum reviewed and discussed its financial analyses with the Board (including Mr. Kinnon), and further states that the Board considered the financial analyses provided by Craig-Hallum as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, Kinnon was privy to and had knowledge of the projections for the Company and Precipio and the proposals received from Precipio and communications with Precipio.



64.     Kinnon knew, or was negligent in not knowing, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ rendering the sections of the Proxy identified above, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to be materially incomplete, false, and/or misleading.  Indeed, Kinnon was required to review ▮▮▮▮ ▮▮▮▮▮ and Craig-Hallum's valuation analyses and presentations, question Craig-Hallum as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. Mr. Kinnon's name appears 174 times in the Proxy and its attachments, and he is a signatory to the Proxy on multiple pages.  Mr. Kinnon urged Transgenomic stockholders to "carefully read this proxy statement," yet he failed to do so himself.

65.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ including Defendant Kinnon. The Proxy also indicates that Defendant Kinnon was presented with and aware of ▮▮▮▮▮▮▮▮▮ in the months preceding the execution of the Merger Agreement; indeed,

representatives of Precipio and Transgenomic, including Mr. Kinnon, negotiated the terms of the Transaction based upon the projections of both companies. *See* Proxy 35.  And the Proxy explicitly states that "the management of Precipio prepared and provided to Transgenomic internal financial projections for the fiscal years ending December 31, 2016 through December 31, 2020. Such projections were also furnished to the Transgenomic Board and Craig-Hallum, in connection with the Transgenomic Board's consideration of the Transaction and Craig-Hallum's opinion analysis." Proxy 59.  Mr. Kinnon was a member of the Transgenomic Board, and undoutbeldy was provided with and reviewed ███████████████ in connection with assessing the terms of the Transaction and Craig-Hallum's financial analyses.  Mr. Kinnon was therefore negligent in failing to realize that the Proxy ████████████████████████████████████████ █████████████████████ or in failing to correct the false statements and material omissions if he was aware of them.

66.     The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Mr. Kinnon was negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which he was required to do carefully as the Company's CEO, CFO, and director.  Indeed, Mr. Kinnon was intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Proxy.

67.     Transgenomic is also deemed negligent as a result of Mr. Kinnon's negligence in preparing and reviewing the Proxy.  The Merger Agreement actually imputes Mr. Kinnon's knowledge to the Company.  *See* A-11 to Proxy.

68.     Precipio, Inc. (New Precipio) is also liable for Kinnon's and Transgenomic's violations of the Exchange Act as Transgenomic's successor entity.

69.     The misrepresentations, falsehoods, and omissions in the Proxy were material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Transaction.

70.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain stockholder approval of the Transaction, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Transaction and the true value of their shares at the time of the Transaction) in an amount to be determined at trial.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9 and Regulation G promulgated thereunder.

## COUNT II

**(Against Kinnon for Violations of Section 20(a) of the Exchange Act)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     Kinnon acted as a controlling person of Transgenomic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his positions as an officer and director of Transgenomic, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, Kinnon had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false, and misleading.

73.     Kinnon was provided with and had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, Kinnon had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the recommendation of Kinnon to approve the Transaction.  Kinnon is also a signatory to the Proxy on several pages.  Kinnon was thus directly involved in preparing this document.

75.     In addition, as the Proxy sets forth at length, and as described herein, Kinnon was involved in negotiating, reviewing, and approving the Merger Agreement and preparing the Proxy. The Proxy purports to describe the various issues and information that Kinnon and the Board reviewed and considered.  Kinnon participated in drafting and/or gave his input on the content of those descriptions.

76.     By virtue of the foregoing, Kinnon violated Section 20(a) of the Exchange Act.

77.     As set forth above, Kinnon had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC rules promulgated thereunder by their acts and omissions as alleged herein.  By virtue of his position as a controlling person, Kinnon is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result Kinnon's conduct, Plaintiff and the Class suffered damages and actual economic losses (*i.e.* the difference between the value they received as a result of the Transaction and the true value of their shares at the time of the Transaction) in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

C.      Awarding Plaintiff and the Class compensatory and/or recissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

D.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 25, 2017                    Respectfully Submitted,

*s/ David W. Rowe*
**KINSEY ROWE BECKER & KISTLER, LLP**
DAVID W. ROWE - 19155
Pioneers Pointe Plaza
3800 VerMaas Place, Suite 100
Lincoln, NE 68502-4454
Main Phone: (402) 438-1313
Direct Line: (402) 434-9050
Fax: (402) 438-1654
Email: drowe@krbklaw.com

*Counsel for Lead Plaintiff Jesse Campbell and Liaison Counsel for the Putative Class*

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel:  212-971-1341
Fax:  212-202-7880
Email:  jmonteverde@monteverdelaw.com
          mschreiner@monteverdelaw.com

*Counsel for Jesse Campbell and Lead Counsel
for the Putative Class*